IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| HAROLD B. WILSON, | ) | 4:11CV3215 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| DIANE SABATKA-RINE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Defendants' Motion for Summary Judgment. (Filing No. 53.)  Also pending are Plaintiff's Motion to Reinstate Final Progression Order, Motion for Appeal Conference, and Motion for Sanctions (hereafter "Plaintiff's Motion to Reinstate").  (Filing No. 62.)  For the reasons set forth below, Defendants' Motion for Summary Judgment is granted in part.  Plaintiff's Motion to Reinstate is denied; however, a new progression order will be entered.

## I.   BACKGROUND

Plaintiff, who is currently confined in the Lincoln Correctional Center ("LCC"), filed his original Complaint in this matter on November 25, 2011.  (Filing No. 1; *see also* Docket Sheet.)  On January 18, 2012, he filed an Amended Complaint naming nine employees of the Nebraska Department of Correctional Services ("DCS") as Defendants in both their individual and official capacities.  (Filing No. 12 at CM/ECF pp. 1, 2.)  The court reviewed the Amended Complaint to determine whether summary dismissal would be appropriate under 28 U.S.C. §§ 1915(e) and 1915A.  (*See* Filing No. 15 at CM/ECF p. 1.)  After completing this review, the court dismissed with prejudice Plaintiff's claims for monetary damages against Defendants in their official capacities, dismissed without prejudice Plaintiff's due process claims related to his protective custody classification, concluded that the Amended Complaint fails to state a claim upon which relief may be granted, and provided Plaintiff with an opportunity to amend his Amended Complaint.  (*See generally* Filing No. 15.)

Plaintiff filed a four-count Second Amended Complaint, (filing no. 18), and the court conducted another review to determine whether summary dismissal was in order (filing no. 19).   The court dismissed Claim One, which reasserted Plaintiff's previously-dismissed protective custody classification claim and added new allegations that Plaintiff's "single cell" status was removed without due process. (Filing No. 19 at CM/ECF pp. 2-3.)  The court also dismissed Claim Four, which alleged that certain inmates received preferential treatment as a part of a transition program.  (*Id.* at CM/ECF p. 4.)  The court determined, however, that Claim Two (which alleges First Amendment violations), Claim Three (which alleges a First Amendment access to courts violation), and Plaintiff's state law claims could proceed to service.  (*Id.* at CM/ECF p. 3-4.)

In Claim Two, Plaintiff alleges that Defendants interfered with his practice of the Wiccan religion by 1) preventing him from attending "Samhain and Yule rituals"; 2) transferring him from the Nebraska State Penitentiary ("NSP") to the LCC, where Wiccan inmates receive comparatively less class time, worship time, and access to certain religious items; 3) denying Plaintiff's request to attend two Wiccan Sabbats in 2011; 4) confiscating Plaintiff's personal Book of Shadows, which records his religious notes, rituals, spells, reflections, and meditations; 5) banning a particular "Wiccan clergy person" from visiting Plaintiff during his time at NSP and failing to locate a replacement; 6) depriving Plaintiff of his religious medallion for more than 30 days; and 7) denying Plaintiff access to a tarot card deck, runes, and gemstones while he was in segregated confinement.  (Filing No. 18 at CM/ECF pp. 7-9.)  Plaintiff also alleges that his cell does not provide enough space for him to cast a ritual circle.  (*Id.* at CM/ECF p. 7.)  Separately, Plaintiff alleges in Claim Two that Defendants interfered with his participation in a paralegal studies course by confiscating his textbook and "forc[ing him] to send out three associated Cd-roms which [were] part of the course." (*Id.* at CM/ECF p. 8.)

In Claim Three, Plaintiff alleges that Defendants restricted him to no more than 50 minutes of law library access per week at NSP. (*Id.* at CM/ECF p. 9-10.) He adds that these restrictions caused him to lose a case, which in turn resulted in the "Sheriff's Execution Sale" of Plaintiff's mobile home. (*Id.*)

Plaintiff completed service upon the following Defendants: Diane Sabatka-Rine, Melvin Rouf, Michael Edison, Randy Bartells, Zarata, Cockrell, Grove, Hoesing, and Famon. (Filing Nos. 22, 23, 24, 25, 26, 27, 28, 29, and 30.) These Defendants were served in their individual capacities, but not in their official capacities. (*See* Docket Sheet.) On November 28, 2012, Plaintiff moved to voluntarily dismiss his claims against "Jose Zarate, Kim Cockrell, Samuel Grove, Damian Hoesing, and Steve Fannon." (Filing No. 51 at CM/ECF p. 2.) This motion was granted, (filing no. 59); thus, only Claims Two and Three against Defendants Sabatka-Rine, Rouf, Edison, and Bartelt in their individual capacities remain viable.[1]

On January 7, 2013, Defendants filed a Motion for Summary Judgment along with a supporting Brief and Index of Evidence. (Filing Nos. 53, 54, and 55.) On January 22, 2013, Plaintiff filed a Reply in Opposition to Defendants' Motion for Summary Judgment. (Filing No. 56.)

This court's local rules require a party moving for summary judgment to set forth "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitle[] the moving party to judgment as a matter of law." NECivR 56.1(a)(1). If the non-moving party opposes the motion,

---

[1] Although a summons was issued for "Randy Bartells," documents in the record show that the correct spelling of this Defendant's surname is Bartelt. (*Compare* Filing No. 22 *with* Def.'s Index, Ex. 4, Bartelt Aff., Filing No. 55-9.) In the interest of clarity, the court will use the correct spelling.

Hereafter, the term "Defendants" refers to Sabatka-Rine, Rouf, Edison, and Bartelt collectively and in their individual capacities only, unless otherwise indicated.

that party must "include in its brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). The non-moving party's response must "state the number of the paragraph in the movant's statement of material facts that is disputed" and must contain pinpoint citations to the evidence upon which the non-moving party relies. *Id*. "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." *Id*. (emphasis omitted).

Defendants have submitted a statement of material facts in accordance with the court's local rules, (*see* filing no. 54 at CM/ECF pp. 2-13), and they have authenticated the evidence upon which they rely, (*see* filing no. 55). Although Plaintiff has responded to Defendants' Motion for Summary Judgment, he does not dispute any of the numbered paragraphs in Defendants' statement of material facts. (*See generally* Filing No. 56.) Nor does he cite any evidence in support of his response. (*See generally id*.) Plaintiff requests that his deposition (which is cited by Defendants in support of their Motion for Summary Judgment) be stricken because "the court has refused to allow [Plaintiff's] request for deposing the defendants and witnesses in this case." (*Id*. at CM/ECF p. 6; *see also* Filing No. 59 at CM/ECF pp. 1-2 (denying Plaintiff's Motion for Sanctions and Objection to Interrogatories).) This request is denied, and the court deems this matter fully submitted. The following undisputed material facts are adopted for the purposes of this Memorandum and Order.

## II.   UNDISPUTED MATERIAL FACTS

1.     Nebraska law provides that DCS "shall fulfill those functions of state government relating to the custody, study, care, discipline, training, and treatment of persons in correctional and detention institutions." Neb. Rev. Stat. § 83-922.

2.     DCS maintains a grievance procedure governed by the Nebraska Administrative Code, Title 68, Chapter 2. (*See* Def.'s Index, Ex. 5, Gilbride Aff. ¶¶ 6-7 & Ex. A, Filing No. 55-11.)

3.      DCS's grievance procedure is set forth in Administrative Regulation (AR) 217.02.  (Def.'s Index, Ex. 2, Sabatka-Rine Aff. Ex. C, Filing No. 55-5 at CM/ECF p. 12.)

4.      Plaintiff began his incarceration at DCS's NSP in 1986.  (Def.'s Index, Ex. 1, Wilson Dep. at 9, Filing No. 55-1 at CM/ECF p. 3.)  He remained at NSP until January 4, 2012, when he was transferred to LCC.  (*Id.*, Ex. 1, Wilson Dep. at 22, Filing No. 55-1 at CM/ECF p. 7.)

5.      Plaintiff has been practicing the Wiccan religion since he was 18 years old.  (Def.'s Index, Ex. 1, Wilson Dep. at 30, Filing No. 55-1 at CM/ECF p. 6.)[2]

6.      On or about September 1, 2011, Plaintiff discovered that another inmate was stealing incense from the chapel and selling it on the yard.  When Plaintiff confronted the inmate, the inmate struck Plaintiff.  The fight was not witnessed by NSP staff, but on the following day NSP staff received information about the incident and placed Plaintiff in segregation.  (Def.'s Index, Ex. 1, Wilson Dep. at 23, Filing No. 55-1 at CM/ECF p. 7.)  Plaintiff remained in segregation at NSP's Housing Unit #4 from September 2, 2011, until his transfer to LCC on January 4, 2012.  (*Id.*, Wilson Dep. at 14, Filing No. 55-1 at CM/ECF p. 5; Def.'s Index, Ex. 2, Sabatka-Rine Aff. ¶ 3, Filing No. 55-2 at CM/ECF p. 1.)

7.      When Plaintiff was first placed in segregation, a "significant amount" of his property was taken from him.  (Def.'s Index, Ex. 1, Wilson Dep. at 17, Filing No. 55-1 at CM/ECF p. 5.)  He was directed to send some of this property (i.e., certain paperwork, law books, religious books, and CD-ROMs related to a paralegal course he was taking) out of the institution for safety and security purposes.  (*Id.*, Wilson Dep. at 17-19, 42, Filing No. 55-1 at CM/ECF p. 5, 11; Def.'s Index, Ex. 3, Edison Aff. ¶ 4, Filing No. 55-8 at CM/ECF p. 2.)  Other items (i.e., Plaintiff's Book of Shadows,

---

[2] Pages of Defendants' Exhibit 1 are out of sequence.

Religious Medallion, Tarot Cards, Religious Runes, and Religious Gemstones) were sent to property control. (Def.'s Index, Ex. 3, Edison Aff. ¶ 5, Filing No. 55-8 at CM/ECF p. 2.)

8.     NSP's Operational Memorandum 204.001.101, which was in effect at relevant times, states that inmates are allowed to keep a religious necklace with a medallion, "up to 5 books/magazines," and one deck of poker or pinochle cards while in segregated confinement at Housing Unit #4. (Def.'s Index, Ex. 3, Edison Aff. ¶ 6, Filing No. 55-8 at CM/ECF p. 2; *see also id.*, Ex. 2, Sabatka-Rine Aff. ¶¶ 4-9, Filing No. 55-2 at CM/ECF p. 2-3.)

**A.     Plaintiff's Book of Shadows**

9.     Plaintiff's Book of Shadows consisted of a three-ring binder containing books, spells, rituals, prayers, and insights written by Plaintiff. (Def.'s Index, Ex. 1, Wilson Dep. at 19, Filing No. 55-1 at CM/ECF p. 5.) Plaintiff describes the Book of Shadows as being similar to a diary. (*Id.*)

10.     Plaintiff states that at some unspecified time, he asked for his Book of Shadows to be returned. He was informed that he could not have the binder because it contained steel. Plaintiff then asked for the contents of the Book of Shadows to be returned, and he was informed by NSP staff that the contents were not in their possession. Plaintiff filed a grievance about this matter, and according to Plaintiff, NSP staff reported "that they didn't have it." (Def.'s Index, Ex. 1, Wilson Dep. at 20, Filing No. 55-1 at CM/ECF p. 5.)

11.     NSP records show that on November 16, 2011, Plaintiff submitted an Informal Grievance Resolution Form requesting that his Book of Shadows be returned to him. (Def.'s Index, Ex. 2, Sabatka-Rine Aff. ¶ 12, Filing No. 55-2 at CM/ECF p. 3; *id.*, Sabatka-Rine Aff. Ex. D, Filing No. 55-5 at CM/ECF p. 18.) On November 29, 2011, Defendant Edison, who serves as the Unit Manager of Housing Unit #4 at NSP,

6

responded to Plaintiff's grievance by writing, "This incident is being reviewed and appropriate actions will be taken." (Def.'s Index, Ex. 2, Sabatka-Rine Aff. ¶ 13, Filing No. 55-2 at CM/ECF p. 3; *id.*, Sabatka-Rine Aff. Ex. D, Filing No. 55-5 at CM/ECF p. 18.) Defendant Sabatka-Rine, who serves as the Warden at NSP, states that NPS staff received no further grievances from Plaintiff regarding the Book of Shadows or its contents. (*Id.*, Sabatka-Rine Aff. ¶¶ 1, -1, Filing No. 55-2 at CM/ECF pp. 1, 3.)

**B.    Plaintiff's Religious Medallion**

12.    When Plaintiff was placed in segregation on the day after the fight, an unidentified officer took Plaintiff's Religious Medallion from him. (Def.'s Index, Ex. 1, Wilson Dep. at 55-57, Filing No. 55-1 at CM/ECF pp. 14-15.) A property control record indicates that Defendant Edison returned the Religious Medallion to Plaintiff on October 13, 2011. (Def.'s Index, Ex. 3, Edison Aff. Ex. A, Filing No. 55-8 at CM/ECF p. 4.)

**C.    Plaintiff's Tarot Cards and Gemstones**

13.    During his time in administrative segregation at NSP, Plaintiff was not allowed to possess his Tarot Cards and Religious Gemstones. (Def.'s Index, Ex. 1, Wilson Dep. at 59-60, Filing No. 55-1 at CM/ECF pp. 14-15.) The Tarot Cards and Gemstones were returned to Plaintiff upon his transfer to LCC on January 4, 2012. (*Id.*)

**D.    Ritual Circle**

14.    Plaintiff's religious beliefs require him to worship in a ritual circle during each of eight annual Sabbats, during a full moon, and sometimes during a new moon. (Def.'s Index, Ex. 1, Wilson Dep. at 29, Filing No. 55-1 at CM/ECF p. 6.)

15.     Plaintiff is not a "solitary practitioner" of Wicca; he always meets with other Wiccans of similar faiths to practice his religion.  (Def.'s Index, Ex. 1, Wilson Dep. at 30-31, Filing No. 55-1 at CM/ECF p. 6.)

16.     Plaintiff cannot cast a ritual circle in his cell because there is not enough space for one, and he cannot practice Wicca with other inmates in his cell because inmates are not allowed to enter each other's cells.  (Def.'s Index, Ex. 1, Wilson Dep. at 31-32, Filing No. 55-1 at CM/ECF p. 6.)  He can only cast ritual circles in the religious center.  (*Id*., Ex. 1, Wilson Dep. at 32, Filing No. 55-1 at CM/ECF p. 6.)

17.     Plaintiff was permitted to practice ritual circle worship with other Wiccans at the NSP Religious Center once per week.  (Def.'s Index, Ex. 1, Wilson Dep. at 32-33, Filing No. 55-1 at CM/ECF p. 6, 9.)

## E.     Wiccan Clergy

18.     Cynthia Blodgett-Griffin is the high priestess of the order of the Red Grail, which is a local Wiccan coven.  (Def.'s Index, Ex. 1, Wilson Dep. at 43-44, Filing No. 55-1 at CM/ECF p. 11.)

19.     Plaintiff was not allowed to see Blodgett-Griffin during his time in segregation.  (Def.'s Index, Ex. 1, Wilson Dep. at 43-44, Filing No. 55-1 at CM/ECF p. 11.)

20.     According to Defendant Bartelt, who serves as the Religious Coordinator at NSP, Blodgett-Griffin was suspended from DCS indefinitely, effective August 24, 2011, for reasons unrelated to Plaintiff's lawsuit.  (Def.'s Index, Ex. 4, Bartelt Aff. ¶¶ 1, 3, Filing No. 55-9 at CM/ECF p. 1.)

21.     DCS AR 208.01, which is titled Religious Services, states, "If requested, the Religious Coordinator shall assist the inmate in contacting religious

representatives.   However, the inmate is not guaranteed a specific religious representative." (Def.'s Index, Ex. 4, Bartelt Aff. Ex. A at 8, Filing No. 55-10 at CM/ECF p. 2.)

22.     Inmate Interview Request forms dated December 28, 2011, and January 4, 2012, indicate that DCS staff contacted a Rev. Philip Kessler on behalf of Plaintiff. (Def.'s Index, Ex. 4, Bartelt Aff. Exs. B-C, Filing No. 55-10 at CM/ECF pp. 8-9.) Rev. Kessler was a member of the Red Grail, the head of a second Wiccan coven called Blue Moon Covenant, and the director of the Pagan Allied Network in Central Nebraska. (Def.'s Index, Ex. 1, Wilson Dep. at 48, Filing No. 55-1 at CM/ECF p. 12.) A clergy visitor application was sent to Rev. Kessler, but Rev. Kessler did not return the application.   (Def.'s Index, Ex. 4, Bartelt Aff. ¶¶ 11-12, Filing No. 55-9 at CM/ECF p. 2.)

23.     During his deposition, Plaintiff explained that he was alleging that Defendants violated their own rules by failing to locate new Wiccan volunteers to participate in religious programming at LCC. (Def.'s Index, Ex. 1, Wilson Dep. at 45, Filing No. 55-1 at CM/ECF p. 12.)

24.     Plaintiff and other Wiccans at LCC asked the LCC Religious Coordinator, who is not a defendant in this action, to locate volunteers and Wiccan representatives to come to LCC to participate in worship services and classes at LCC. (Def.'s Index, Ex. 1, Wilson Dep. at 46-47, Filing No. 55-1 at CM/ECF p. 12.) The LCC Religious Coordinator gave Plaintiff the address for Rev. Kessler. (Def.'s Index, Ex. 1, Wilson Dep. at 47, Filing No. 55-1 at CM/ECF p. 12.) Plaintiff knew Rev. Kessler, and he chose not to contact him because he assumed Rev. Kessler would not agree to serve as a religious representative. (Def.'s Index, Ex. 1, Wilson Dep. at 47-49, Filing No. 55-1 at CM/ECF p. 12-13.) Plaintiff based this assumption on comments Rev. Kessler made on a radio program. (Def.'s Index, Ex. 1, Wilson Dep. at 49, Filing No. 55-1 at CM/ECF p. 13.) Plaintiff did not take any other action with the Religious Coordinator to have a Wiccan clergy member come to LCC. (*Id.*)

9

**F.   Plaintiff's Paralegal Course**

25.   When Plaintiff was placed in segregation in September 2011, he was participating in a paralegal course through Adams State College.  (*See* Def.'s Index, Ex. 1, Wilson Dep. at 41-42, Filing No. 55-1 at CM/ECF p. 11.)

26.   Plaintiff's textbook was confiscated when he was placed in segregation. The book was returned to him sometime later, and he was able to complete his paralegal degree after a three-month delay.  Plaintiff states that the delay remains a part of the instant lawsuit, but the textbook itself is no longer part of the case.  (Def.'s Index, Ex. 1, Wilson Dep. at 41-42, Filing No. 55-1 at CM/ECF p. 11.)

**G.   Plaintiff's Access to the Courts Claim**

27.   Plaintiff's access to the courts claim is based on events that occurred during his segregated confinement at NSP between September 2011 and January 2012. (Def.'s Index, Ex. 1, Wilson Dep. at 13-14, 87, Filing No. 55-1 at CM/ECF p. 4, 22.) More specifically, Plaintiff's claim pertains to his involvement in a case entitled *Ascentia Real Estate Investment Company FKA Colorado Real Estate and Investment Co., d/b/a Woodlawn Estates Mobile Homes v. Glover*, No. CI 11 14182 (hereinafter *Glover*), in the County Court of Lancaster County, Nebraska.  (Def.'s Index, Ex. 1, Wilson Dep. at 95-96, Filing No. 55-1 at CM/ECF p. 24; Def.'s Index, Ex. 1, Wilson Dep. Ex. 2, Filing No. 55-1 at CM/ECF p. 43.)

28.   *Glover* was commenced on December 8, 2011, by Ascentia Real Estate Investment Company ("Ascentia"), which filed a petition for restitution to obtain immediate possession of a mobile home lot (hereinafter "the Premises") located in Lincoln, Nebraska.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 2 at 1, Filing No. 55-1 at CM/ECF p. 43.)

10

29.     The petition alleged that Jillian B. Glover occupied a mobile home situated on the Premises under the terms of a written lease agreement; that Harold B. Wilson[3] and Gracy S. Sedlak[4] were the owners of the mobile home situated on the Premises; and Glover, Wilson, and Sedlak failed to pay rent, late fees, water and sewer charges, trash removal, and mowing charges for the Premises.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 2 at 1-2, Filing No. 55-1 at CM/ECF pp. 43-44.)

28.     On December 9, 2011, a summons was issued for service of the petition upon Wilson at the Premises.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 3 at 1, Filing No. 55-1 at CM/ECF p. 49.)  The summons was returned unserved.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 3 at 2, Filing No. 55-1 at CM/ECF p. 50.)

29.     On December 22, 2011, Ascentia moved for an order allowing substitute service upon Wilson, Glover, and Sedlak.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 4, Filing No. 55-1 at CM/ECF p. 51-52.)  This motion was granted on December 23, 2011, and the court determined that service "at the Defendants' residence and by regular United States mail will give Defendants notice of this action."  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 5, Filing No. 55-1 at CM/ECF p. 53.)

30.     A county court Journal Entry and Order indicates that after Wilson, Glover, and Sedlak failed to appear at a hearing on January 5, 2012, the court concluded that the rental contract existing between the parties had been breached; that there was unpaid rent owed to Ascentia; and that a writ of restitution would issue "commanding the Sheriff or Constable to remove defendant(s) and all other occupants

---

[3] In the interest of clarity, Plaintiff will be referred to by his surname ("Wilson"), rather than "plaintiff" or "defendant," throughout the following discussion of *Glover*.

[4] Sedlak's name is occasionally spelled "Sedlack" in various documents.  The court will use the spelling "Sedlak," which corresponds to the spelling used by Ms. Sedlak herself.  (*See, e.g.*, Def.'s Index, Ex. 1, Wilson Dep. Ex. 12 at 1, Filing No. 55-1 at CM/ECF p. 64.)

from the subject premises."   (Def.'s Index, Ex. 1, Wilson Dep. Ex. 7 at 3, Filing No. 55-1 at CM/ECF p. 58.)   Judgment was entered in favor of Ascentia and against Glover, Wilson, and Sedlak for restitution of the Premises.  (*Id*.)

31.     The writ of restitution was issued on January 6, 2012.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 10, Filing No. 55-1 at CM/ECF p. 62.)  The writ commanded the sheriff "to cause the defendant(s) to be forthwith removed from the premises" and to "levy the goods and chattels of said defendant(s)."  (*Id*.)

32.     On January 10, 2012, the sheriff posted a copy of the writ of restitution on the mobile home.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 16, Filing No. 55-1 at CM/ECF p. 71.)   The sheriff levied on the mobile home, which remained on the Premises, on January 12, 2012.  (*Id.*)  Beginning on January 23, 2012, the sheriff caused a notice to be published in the Daily Reporter for four consecutive weeks stating that the mobile home would be offered for sale at public auction on February 23, 2012.  (Def.'s Index, Ex. 1, Wilson Dep. Exs. 16-17, Filing No. 55-1 at CM/ECF pp. 71-72.)

33.     On January 31, 2012, Wilson and Sedlak filed an objection to the sale of the mobile home.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 12 at 1, Filing No. 55-1 at CM/ECF p. 64.)  A Lancaster County Court Civil Worksheet indicates that the county court reviewed Wilson's and Sedlak's motion on February 3, 2012, and noted that "Judgment was entered on 1/5/12 [and] 1/26/12."  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 13, Filing No. 55-1 at CM/ECF p. 66.)

34.     On February 21, 2012, Wilson submitted to the county court a proposed injunction to stop the sale of the mobile home.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 14 at 1-3, Filing No. 55-1 at CM/ECF pp. 67-69.)  Wilson's request to stop the sale was denied by the court on February 22, 2012.  (Def.'s Index, Ex. 1, Wilson Dep. Ex. 15, Filing No. 55-1 at CM/ECF p. 70.)

12

35.     On February 23, 2012, ARA Homes purchased the mobile home at the public auction for the sum of $1,500. (Def.'s Index, Ex. 1, Wilson Dep. Ex. 16, Filing No. 55-1 at CM/ECF p. 71.)  Sedlak appeared at the auction and attempted to buy the mobile home back, but she did not have enough money to do so. (*Id*., Ex. 1, Wilson Dep. at 70, Filing No. 55-1 at CM/ECF p. 18.)

36.     Wilson states that he learned about Ascentia's lawsuit in late November or early December 2011 when a Dr. Barnwell visited him and informed him about it. (Def.'s Index, Ex. 1, Wilson Dep. at 69, 74, Filing No. 55-1 at CM/ECF p. 18-19.) After Wilson spoke with Dr. Barnwell, he communicated with Sedlak via mail about the case. (Def.'s Index, Ex. 1, Wilson Dep. at  76, Filing No. 55-1 at CM/ECF p. 19.) Also, in approximately November 2011, Wilson was allowed to have daily phone calls with Sedlak. (*Id.*)  Wilson told Sedlak "to make sure she goes to all the court proceedings and make sure that she keeps [Wilson] informed of whatever that she's served." (*Id.*)  Wilson also began to conduct legal research to learn methods of stopping the sheriff's sale. (Def.'s Index, Ex. 1, Wilson Dep. at  at 69-70, Filing No. 55-1 at CM/ECF p. 18.)  He attempted to contact Ascentia's counsel to discuss the matter, but she refused to speak with him. (Def.'s Index, Ex. 1, Wilson Dep. at 72, Filing No. 55-1 at CM/ECF p. 18.) Sedlak also attempted to negotiate with Ascentia's counsel, but she was unsuccessful. (Def.'s Index, Ex. 1, Wilson Dep. at  at 71, Filing No. 55-1 at CM/ECF p. 18.)

## III.     ANALYSIS

### A.    Standard of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schlif v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012).  In passing upon a motion

13

for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.   Defendants' Motion for Summary Judgment**

Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities pursuant to the doctrine of qualified immunity. (*E.g.*, Filing No. 54 at CM/ECF p. 2.) "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "An official is entitled to qualified immunity against a § 1983 action unless (1) the facts, construed in the light most favorable to the party seeking damages, establish a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

Defendants also argue that some of Plaintiff's claims must be dismissed because 1) Plaintiff failed to exhaust administrative remedies; 2) the claims are moot; or 3)

14

Plaintiff has failed to establish that Defendants had any personal involvement in any wrongdoing, and they cannot be held liable on a theory of respondeat superior. (Filing No. 54 at CM/ECF pp. 23-26.)

The court will analyze each of Plaintiff's claims in turn to determine whether Defendants are entitled to summary judgment.

1.   *Book of Shadows*

Defendants argue that Plaintiff's claims surrounding the confiscation and loss of his Book of Shadows must be dismissed because Plaintiff failed to exhaust administrative remedies.

Under 42 U.S.C. § 1997e(a), a prisoner may not bring an action challenging prison conditions pursuant to 42 U.S.C. § 1983 "until such administrative remedies as are available are exhausted."  The Supreme Court instructs that "'exhaustion' under § 1997e(a) means proper exhaustion, that is, 'using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).   "Therefore, 'a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court.'"  *Id.* (citation omitted).

The record shows that DCS rules and regulations provide for a three-step grievance process. (*E.g.*, Def.'s Index, Ex. 5, Gilbride Aff. Ex. A at 2-6, Filing No. 55-11 at CM/ECF p. 4-8.)  The record also shows that Plaintiff completed an Informal Grievance Resolution Form on November 16, 2011, requesting return of the Book of Shadows, but he did not complete the three-step grievance process.  Therefore, the court agrees with Defendants that Plaintiff failed to exhaust his administrative remedies, and Plaintiff's claims regarding the Book of Shadows must be dismissed.

15

2.    *Medallion*

Defendants argue that Plaintiff's claim regarding the confiscation of his religious medallion must be dismissed because there is no evidence that any of the named defendants had any personal involvement in the confiscation.  (Filing No. 54 at CM/ECF pp. 26, 30.)  The court agrees.  There is evidence that Defendant Edison returned the religious medallion to Plaintiff on October 13, 2011, but there is no evidence that Edison (or any other Defendant) seized the religious medallion when Plaintiff was taken to segregation.  Plaintiff testified that he could not remember who took the medallion, though he believed it might have been an officer named Cockral. (Def.'s Index, Ex. 1, Wilson Dep. at 57, Filing No. 55-1 at CM/ECF p. 15.) Defendants cannot be held liable for the seizure of the religious medallion under a theory of respondeat superior.  *E.g., Nelson v. Corr. Med. Serv.*, 583 F.3d 522, 534-35 (8th Cir. 2009) (concluding, in a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability).  Given the undisputed facts, the court finds that Defendants are entitled to summary judgment on Plaintiff's claims regarding his religious medallion.

3.    *Tarot Cards and Gemstones*

Defendants argue that Plaintiff's claims involving the confiscation of his Tarot Cards and Gemstones are moot because Plaintiff "is no longer incarcerated at NSP and subject to the allegedly offending policies" and because the items have been returned. (Filing No. 54 at CM/ECF p. 25.)  In support of their argument, Defendants rely upon *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012), which states,

> Zajrael's claim for *injunctive relief* under [the Religious Land Use and Institutionalized Persons Act (RLUIPA)] is moot.  He complains about policies or practices at the [East Arkansas Regional Unit (EARU)], but he was transferred out of that facility in 2006, and is now housed at

the Varner facility.  Because Zajrael is no longer subject to the policies that he challenges, there is no live case or controversy.  The exception to the mootness doctrine for claims capable of repetition yet evading review is not applicable, because Zajrael made no showing that a retransfer to EARU is likely.  Although this court might exercise jurisdiction after a transfer if there was proof that officials moved an inmate for the purposes of mooting his claim, there is no evidence of such motivation in this case.

*Id*. (citations omitted) (emphasis added).  (*See also* Filing No. 54 at CM/ECF pp. 24-25.)

*Zajrael* involved only "official capacity" claims against state employees; therefore, the plaintiff was prohibited from seeking damages under the Religious Land Use and Institutionalized Persons Act, and was limited to seeking prospective relief. *See* 677 F.3d at 355.  In contrast, Plaintiff has brought "individual capacity" claims against Defendants, and he is not prohibited from seeking damages under § 1983. *E.g.*, *Hafer v. Melo*, 502 U.S. 21, 31 (1991) (holding state officers sued in their individual capacities be personally liable for damages under § 1983).  Because Plaintiff is not limited to obtaining only prospective relief, the court is not persuaded that Plaintiff's claims were rendered moot by his transfer from NSP to LCC.  Nor does the fact that Defendants eventually returned the religious items to Plaintiff render his claims moot.

Defendants also argue, in conclusory fashion, that they are immune from suit because "it would not have been clear to a reasonable official in the position of Defendants herein, under the specifically alleged factual context of this case, that any of their conduct was unlawful." (Filing No. 54 at CM/ECF p. 32.)  Defendants' failure to provide any substantive support for this argument renders it difficult for the court to determine whether Defendants are entitled to qualified immunity.  Nevertheless, the court will analyze whether "(1) the facts, construed in the light most favorable to the party seeking damages, establish a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *McKenney*, 635 F.3d at 358 (citing *Pearson*, 555 U.S.at 232).

"Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). Thus, "[c]onstitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the [public] are evaluated under a lesser standard of scrutiny in the context of a prison setting." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 81 (1987)). "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89).

To analyze a claim based on an alleged violation of the First Amendment's Free Exercise Clause, the court should "consider first the threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief.'" *Murphy*, 372 F.3d at 983 (quoting *Hamilton v. Shriro*, 74 F.3d 1545, 1550 (8th Cir. 1996)). The court should then consider the following four factors set forth in *Turner*: 1) whether there is a valid rational connection between the prison regulation and the government interest justifying it; 2) whether there is an alternative means available to the prison inmates to exercise the right; 3) whether an accommodation would have a significant ripple effect on guards, other inmates, and prison resources; and 4) whether there is an alternative that fully accommodates the prisoner at de minimis cost to valid penological interests. *See id.* at 982-83 (citing *Turner*, 482 U.S. at 89-90).

In this case, there is no dispute that the confiscation of Plaintiff's Tarot Cards and Gemstones infringed on Plaintiff's sincerely held religious belief. There is also no dispute that pursuant to NSP policy, inmates in segregation were allowed to keep (among other things) a religious medallion and poker or pinochle cards, but Plaintiff was not allowed to keep his Tarot Cards or Gemstones. After considering the evidence in a light favorable to Plaintiff and with the four *Turner* factors in mind, the court finds that there is a genuine issue whether Plaintiff was deprived of his Tarot Cards in

18

violation of the First Amendment.[5]  Furthermore, the court is not persuaded that a reasonable official would not have known that confiscating Plaintiff's Tarot Cards while allowing other inmates to possess playing cards would offend Plaintiff's clearly established First Amendment rights.  In short, Defendants are not entitled to qualified immunity on Plaintiff's claim involving the confiscation of his Tarot Cards.

Finally, Defendants argue that there is no evidence that Sabatka-Rine, Rouf, or Bartelt had any personal knowledge of, or involvement in, the confiscation of Plaintiff's religious property.  (Filing No. 54 at CM/ECF p. 26.)  The court agrees. Because there is no evidence that Sabatka-Rine, Rouf, or Bartelt had any connection with the confiscation of the Tarot Cards and Gemstones, and because they cannot be held personally liable on a theory of respondeat superior, they are entitled to summary judgment on this claim.  Defendants do not suggest, however, that Edison had no personal involvement in the confiscation of these items.  (*See id*. at CM/ECF pp. 30-32.)  Therefore, Edison is not entitled to summary judgment.

In summary, Plaintiff's claims that Defendants confiscated his Tarot Cards and Gemstones in violation of the First Amendment remain viable against Edison in his individual capacity.  In all other respects, Defendants are entitled to summary judgment on these claims.

4.    *Ritual Circle*

Defendants argue that Plaintiff's inability to cast a ritual circle in his cell does not violate the First Amendment because "the evidence shows it is not part of

---

[5] The parties' briefs and the evidence summarized therein do not provide the court with sufficient information about the Plaintiff's Gemstones to permit a well-reasoned determination about whether their confiscation violated the First Amendment. The court therefore defers ruling on that issue pending additional facts and argument.

[Plaintiff's] sincerely held religious belief to perform ritual circle worship in his cell." (*Id*. at CM/ECF p. 18.)  Defendants explain,

> [Plaintiff's] sincerely held religious belief is that he practices ritual circle worship at the LCC religious center with other Wiccans. [Plaintiff] never has other Wiccans join him in his cell in order to perform ritual circle worship.  The only place at LCC with enough space for [Plaintiff] to adequately cast a large enough ritual circle for worship with other Wiccans is the LCC religious center. [Plaintiff] is currently allowed to cast ritual circles large enough to practice his religious belief at the LCC religious center with the other LCC Wiccans.
>
> Consequently, the size of [Plaintiff's] cell is immaterial to the adequate practice of [Plaintiff's] sincerely held religious beliefs because [Plaintiff] never casts ritual circles in his cell and [Plaintiff] never has other Wiccans join him in his cell for religious worship.

(*Id*.)

The court disagrees with Defendants' suggestion that the size of Plaintiff's cell is immaterial to the practice of his religion.  Indeed, the record clearly shows that Plaintiff does not cast ritual circles in his cell because he lacks sufficient space and because other Wiccans (with whom he must practice in accordance with his sincere beliefs) are not allowed into Plaintiff's cell.  There is no indication that if these space and access restrictions were removed, Plaintiff would not cast his ritual circles in his cell.  Put differently, the court is not persuaded that "the evidence shows it is not part of [Plaintiff's] sincerely held religious belief to perform ritual circle worship in his cell."  (*Id*. at CM/ECF p. 18.)

Nevertheless, there is no dispute that Plaintiff was allowed to cast ritual circles of adequate size, and with other Wiccan inmates participating, in the NSP religious center once per week.  Plaintiff has not claimed that this alternative is somehow inadequate.  Nor has he claimed that the Defendants should increase the size of

20

Plaintiff's cell or alter the prison rules regarding inmates' access to one another's cells to accommodate Plaintiff's religious beliefs.  In short, after considering the *Turner* factors (*see supra* Part III.B.3), the court agrees that Plaintiff's inability to cast ritual circles in his cell does not violate the First Amendment, and that Defendants are entitled to summary judgment on this claim.

5. *Wiccan Clergy*

Plaintiff alleges that Defendants made no efforts to locate and recruit Wiccan clergy to minister to Plaintiff after he was transferred to LCC.  Defendants argue that the undisputed facts do not support Plaintiff's claim.  (Filing No. 54 at CM/ECF p. 19.)  The court agrees.  The record shows that the LCC Religious Coordinator identified Rev. Kessler as a potential volunteer and provided Plaintiff with Rev. Kessler's contact information.  Plaintiff then determined on his own not to contact Rev. Kessler, and he took no further action with the Religious Coordinator to attempt to locate an alternate clergy person.  Because there is no indication that any Defendant acted or failed to act in a manner that infringed upon Plaintiff's sincerely held religious beliefs by hindering his ability to obtain the services of a clergy person, Plaintiff cannot establish the "threshold issue" of his claim.  *See Murphy*, 372 F.3d at 983.

6. *Paralegal Course*

Plaintiff has alleged that Defendants interfered with his participation in a paralegal studies course by confiscating his textbook and forcing him to send course-related CD-ROMs out of the institution.  (Filing No. 18 at CM/ECF p. 8.)  Defendants argue that this claim must be dismissed because it has no connection with Plaintiff's religion.  (Filing No. 54 at CM/ECF pp. 18-19.)  It is well-established, however, that restrictions limiting inmates' access to non-religious books may be the subject of First Amendment claims.  *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 548-52 (1979) (concluding that a prohibition on inmates' receipt of hardback books did not violate

the First Amendment because the restriction was a rational response to a security problem).

Defendants also suggest that Plaintiff's claim is moot because Plaintiff received his paralegal degree in August 2012 and the confiscated textbook has been returned to him. (Filing No. 54 at CM/ECF p. 19.)  For the reasons set forth above in Part III.B.3, the court is not persuaded that the claim is moot.

As noted previously, Defendants offer a conclusory argument that they are immune from suit because "it would not have been clear to a reasonable official in the position of Defendants herein, under the specifically alleged factual context of this case, that any of their conduct was unlawful."  (*Id*. at CM/ECF p. 32.)  Also as noted previously, the vagueness of Defendants' argument makes it difficult for the court to analyze the issue of qualified immunity.  In any case, the record shows that inmates in segregation at NSP were entitled to possess five books or magazines, and yet Plaintiff was not allowed to possess his paralegal course book.  Thus, viewed in a light favorable to Plaintiff, the evidence indicates that the confiscation of the materials violated NSP's own regulation.  Furthermore, after considering and applying the *Turner* factors described above,[6] and given the paucity of the briefing on this issue, the court is not persuaded that the facts fail to establish a First Amendment violation.  Nor is the court persuaded that a reasonable officer would not have been aware that depriving Plaintiff of his course materials without a rational basis for doing so would violate the First Amendment.

---

[6] To refresh, the court should consider: 1) whether there is a valid rational connection between the prison regulation and the government interest justifying it; 2) whether there is an alternative means available to the prison inmates to exercise the right; 3) whether an accommodation would have a significant ripple effect on guards, other inmates, and prison resources; and 4) whether there is an alternative that fully accommodates the prisoner at de minimis cost to valid penological interests.  *See Murphy*, 372 F.3d at 982-83 (citing *Turner*, 482 U.S. at 89-90).

The court agrees with Defendants, however, that there is no evidence that Sabatka-Rine, Rouf, or Bartelt personally interfered with Plaintiff's paralegal course or had any knowledge that such interference was occurring. These Defendants are therefore entitled to summary judgment on this claim. Because Defendants do not appear to argue that Edison had no personal involvement in the confiscation of Plaintiff's course materials (*see* filing no. 54 at CM/ECF pp. 30-32), Plaintiff's claim remains viable against Edison.

### 7.   Access to Courts

Plaintiff alleges that Defendants violated his right to meaningful access to the courts, and as a result of this interference he was unable to mount an effective defense in the *Grove* case. (Filing No. 18 at CM/ECF pp. 9-10.)

The framework for analyzing access to court claims brought by inmates is set forth in *Lewis v. Casey*, 518 U.S. 343 (1996). "*Lewis* explains and narrows the Supreme Court's earlier holding in *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 606 (1977), concerning the nature of the right and the requirements for relief. In the context of an allegedly inadequate prison law library, the Court determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody v. Weber*, 256 F.3d 764, 767-68 (8th Cir. 2001) (quoting *Lewis*, 518 U.S. at 354-55). In short, *Lewis* states,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly and collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating

23

capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

518 U.S. at 355 (emphasis in original).

Viewing the record in a light favorable to Plaintiff, it is clear that Plaintiff has not suffered the sort of injury that falls within the constitutional protections afforded in *Bounds* and *Lewis*. The *Grove* case was not related to Plaintiff's sentence, conviction, or conditions of confinement, and therefore Defendants had no constitutional obligation to provide him with the resources to litigate it. Defendants are therefore entitled to summary judgment on Plaintiff's access to the courts claim.

8.    *Remaining Claims*

The Second Amended Complaint includes allegations that Defendants transferred Plaintiff from NSP to LCC in order to interfere with his practice of Wicca. (Filing No. 18 at CM/ECF pp. 7-8; *see also* Filing No. 56 at CM/ECF p. 4.) It also includes allegations that Defendants refused to allow Plaintiff to attend Samhain and Yule rituals and "two sabbats in 2011." (Filing No. 18 at CM/ECF p. 7.) Defendants' Motion for Summary Judgment does not address these claims; therefore, they remain viable.

In summary, Defendants are entitled to summary judgment on Plaintiff's claims involving the Book of Shadows, the religious medallion, the ritual circle, the Wiccan clergy, and access to the court. Defendants Sabatka-Rine, Rouf, and Bartelt are also entitled to summary judgment on Plaintiff's claims involving Tarot Cards, Gemstones, and paralegal course materials. Plaintiff's claims involving Tarot Cards, Gemstones, and paralegal course materials remain viable against Defendant Edison in his individual capacity. Plaintiff's claims involving his transfer from NSP to LCC and interference with his attendance at religious rituals remain viable against all Defendants in their individual capacities.

24

**C.    Plaintiff's Motion to Reinstate**

Plaintiff has filed a Motion requesting that the court reinstate the Progression Order.  (Filing No. 62; *see also* Filing No. 37.)  This request is well-taken; however, the court finds that entry of a new progression order would be preferable to the reinstatement of the existing one.  Plaintiff's request is therefore denied.

Plaintiff also "moves under Rule 33 for a conference with the Defendants to address possible settlement." (Filing No. 62 at CM/ECF p. 1.)  This request is denied, though the parties are encouraged to discuss the possible settlement of this action.

Finally, Plaintiff asks for sanctions due to Defendants' alleged failure "to answer properly served Interrogatories." (*Id.* at CM/ECF p. 1.)  As there has been no showing that Defendants had notice of Plaintiff's interrogatories before he filed his Motion or that Plaintiff consulted with Defendants' counsel to resolve the dispute, Plaintiff's request for sanctions is denied.

IT IS THEREFORE ORDERED that:

1.    Defendants' Motion for Summary Judgment (filing no. 53) is granted in part and denied in part as set forth in this Memorandum and Order.

2.    Plaintiff's Motion to Reinstate (filing no. 62) is denied.

3.      A new Order Setting Schedule for Progression of Case will be entered.


DATED this 27th day of September, 2013.

                        BY THE COURT:

                        s/ Joseph F. Bataillon
                        United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.